IN THE UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| ENTERTAINMENT SOFTWARE ASSOCIATION AND ENTERTAINMENT MERCHANTS ASSOCIATION,<br><br>Plaintiffs,<br><br>vs.<br><br>CHARLES C. FOTI, JR., in his official capacity as Attorney General of the State of Louisiana; and DOUG MOREAU, in his official capacity on behalf of himself as District Attorney for the Parish of East Baton Rouge, and on behalf of a class of similarly situated individuals in their official capacities,<br><br>Defendants. | CIVIL ACTION NO. 06-431-JJB-CN<br><br>SECTION "D"<br><br>Judge James J. Brady |

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

### INTRODUCTION

Plaintiffs Entertainment Software Association ("ESA") and Entertainment Merchants Association ("EMA") submit this memorandum in support of their motion, pursuant to Federal Rule of Civil Procedure 65, for a preliminary injunction preventing Defendants and their officers, employees, and representatives from enforcing La. R.S. 14:91.14 (hereinafter, the "Act"). The Act was signed into law and became effective on June 15, 2006. On June 16, 2006, this Court entered a temporary restraining order enjoining enforcement of the Act. Plaintiffs respectfully request that the Court preliminarily enjoin the Act until Plaintiffs' constitutional challenges to the law are finally resolved.

Plaintiffs are entitled to a preliminary injunction under controlling legal principles.

Louisiana's sweeping legislation imposes severe criminal penalties, including imprisonment and fines, on the sale, lease or rental of "violent" video games to individuals under age 18. Such content discrimination violates the "bedrock principle underlying the First Amendment . . . that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989).

Plaintiffs are likely to succeed on their constitutional claims. In fact, every previous government attempt to restrict "violent" video games has been struck down as violating the First Amendment. *See Interactive Digital Software Ass'n v. St. Louis County*, 329 F.3d 954 (8th Cir. 2003) ("*IDSA*"); *American Amusement Mach. Ass'n v. Kendrick*, 244 F.3d 572 (7th Cir.), *cert. denied*, 534 U.S. 994 (2001) ("*AAMA*"); *Entertainment Software Ass'n v. Granholm*, 426 F. Supp. 2d 646 (E.D. Mich. 2006) ("*Granholm*"); *Video Software Dealers Ass'n v. Schwarzenegger*, 401 F. Supp. 2d 1034 (N.D. Cal. 2005) ("*Schwarzenegger*"); *Entertainment Software Ass'n v. Blagojevich*, 404 F. Supp. 2d 1051 (N.D. Ill. 2005) ("*Blagojevich*"); *Video Software Dealers Ass'n v. Maleng*, 325 F. Supp. 2d 1180 (W.D. Wash. 2004) ("*Maleng*"); *see also James v. Meow Media, Inc.*, 300 F.3d 683 (6th Cir. 2002) ("*James*") (rejecting attempts to impose tort liability on "violent" video games as inconsistent with the First Amendment); *Sanders v. Acclaim Entm't, Inc.*, 188 F. Supp. 2d 1264 (D. Colo. 2002) (same); *Wilson v. Midway Games, Inc.*, 198 F. Supp. 2d 167 (D. Conn. 2002) (same).

Not only are Plaintiffs likely to prevail on their claims, but the equities also weigh strongly in favor of a preliminary injunction. *See, e.g., AAMA*, 244 F.3d at 580. It is well established that "the loss of First Amendment freedoms for even minimal periods of time constitutes irreparable injury," which justifies the grant of injunctive relief. *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981) (citing *Elrod v. Burns*, 427 U.S.

347, 373 (1976) (plurality)); *see also Ingebretson v. Jackson Public Sch. Dist.*, 88 F.3d 274, 280 (5th Cir. 1996); *Wexler v. City of New Orleans*, 267 F. Supp. 2d 559, 568 (E.D. La. 2003); *Jabr v. Rapides Parish Sch. Bd.*, 171 F. Supp. 2d 653, 666 (W.D. La. 2001). Plaintiffs will undoubtedly suffer irreparable harm if the Act is allowed to go into effect. The First Amendment rights of members of the public—whose rights are also at stake in this facial challenge—will be similarly impaired. Accordingly, the Act should be preliminarily enjoined.

## BACKGROUND

A.  **First Amendment Protection for Video Game Expression.**

Plaintiffs are associations of companies that create, publish, distribute, sell, and/or rent console and computer video games (hereinafter "video games"). Compl. ¶¶ 9-10; Declaration of Douglas Lowenstein, ¶ 2 ("Lowenstein Decl.) (attached as Exhibit 1); Declaration of Crossan Andersen, ¶ 1 ("Andersen Decl.") (attached as Exhibit 2).[1] The Act, if allowed to go into effect, will result in censorship and limit the distribution of some of these creative works, based solely upon their expressive content. Compl. ¶ 12; Lowenstein Decl. ¶ 13; Andersen Decl. ¶ 5. In this facial challenge, Plaintiffs also assert the rights of willing listeners. Compl. ¶ 13.

Video games are a modern form of artistic expression. Like motion pictures and television programs, video games tell stories and entertain audiences through the use of complex pictures, sounds, and text. *See* Declaration of Ted Price, ¶¶ 3-4 ("Price Decl.") (attached as Exhibit 3). These games often contain storylines and character development as richly detailed as (and sometimes based on) books and movies. *Id.* ¶¶ 3-4, 20. Like great literature, these games

---

[1] In support of their Motion, Plaintiffs are submitting the Declaration of Crossan R. Andersen, President of Plaintiff VSDA; Declaration of Douglas Lowenstein, President of Plaintiff ESA; Declaration of Ted Price, President and CEO of Insomniac Games, Inc.; and Declaration of Matthew S. Hellman (with copies of video games that are covered by the Act's restrictions, along with taped recordings of representative play of those games).

often involve themes such as good versus evil, triumph over adversity, struggle against corrupt powers, and quest for adventure. *Id.* ¶¶ 4, 18-61. The courts are unanimous in holding that the content of video games is fully protected by the First Amendment. *See IDSA*, 329 F.3d at 958; *AAMA*, 244 F.3d at 577-78; *James*, 300 F.3d 683 at 695-96; *Granholm*, 426 F. Supp. 2d at 650-651; *Schwarzenegger*, 401 F. Supp. 2d at 1044; *Blagojevich*, 404 F. Supp. 2d at 1056; *Maleng*, 325 F. Supp. 2d at 1184-85.

**B.     The Video Game Industry's Voluntary Rating System.**

Like other popular media, such as motion pictures, television, and music, the video game industry has adopted a voluntary and widely used rating system for video games. *See* Lowenstein Decl. ¶¶ 4-10. That system—which the FTC has called the "most comprehensive" of industry-wide media rating systems—is implemented by the Entertainment Software Rating Board ("ESRB"), a self-regulatory body that assigns independent ratings and descriptions for video game content. *Id.* ¶¶ 5-6. ESRB gives one of six age-specific ratings to each game it rates: EC (Early Childhood); E (Everyone); E10+ (Everyone 10 and older); T (Teen); M (Mature); AO (Adults Only). The ESRB also assigns content descriptors to the game, such as "Cartoon Violence," "Crude Humor," "Fantasy Violence," "Mild Violence," and "Strong Language." *Id.* ¶¶ 7-8.

The purpose of the ESRB system is to provide easily understood information about games to consumers and parents—not to dictate what is ultimately appropriate for individuals of different ages. *Id.* ¶ 7. Like the movie rating system, the ESRB system is entirely voluntary; nonetheless, essentially all video game publishers submit their games for rating. *Id.* ¶ 6. Similarly, video game retailers throughout the nation are part of a widespread and voluntary effort to educate consumers about the ESRB system and to restrict the sale of "M" games to individuals under age 17. *See* Andersen Decl. ¶ 7.

4

## C. The Challenged Statute.

The Act makes it a crime to sell, lease or rent a prohibited "interactive video or computer game" to a minor. Act, § 91.14(A). A person who violates this Act "shall be fined not less than one hundred dollars nor more than two thousand dollars or imprisoned, with or without hard labor, for not more than one year, or both." *Id.* § 91.14(B)(3). A minor is defined as a person under 18 years of age. *Id.* "Interactive video or computer game" means "an object or device that stores recorded data or instructions, receives data or instructions generated by a person who uses it and by processing the data or instructions, creates an interactive game capable of being played or viewed on or through a computer, gaming system, console, or other technology." *Id.* § 91.14(B)(1).

> The video games proscribed by the Act are those that meet all of the following criteria:
>
> (1) The average person, applying contemporary community standards, would find that the video or computer game, taken as a whole, appeals to the minor's morbid interest in violence.
>
> (2) The game depicts violence in a manner patently offensive to prevailing standards in the adult community with respect to what is suitable for minors.
>
> (3) The game, taken as a whole, lacks serious literary, artistic, political, or scientific value for minors.

Act, § 91.14(A)

The Act's stated purposes for its restrictions on "violent" video games are: "that children are the most precious resource of this state and they are worthy of special protection from their government" and that the State has an interest in protecting minors from "physical, psychological, and financial harm." Act, § 1(a).

## ARGUMENT

### I. PLAINTIFFS ARE ENTITLED TO A PRELIMINARY INJUNCTION ENJOINING THE DEFENDANTS FROM IRREPARABLY VIOLATING THEIR CONSTITUTIONAL RIGHTS.

A preliminary injunction is appropriate where, as here: (1) the movant has a substantial likelihood of success on the merits; (2) the movant faces a substantial threat of irreparable harm without the preliminary injunction; (3) the threatened injury outweighs the threatened harm to the defendant; and (4) the preliminary injunction would not disserve the public interest. *See Walgreen Co. v. Hood*, (5th Cir. 2001).

Plaintiffs easily satisfy this standard. Plaintiffs are likely to prevail on their constitutional claims. Indeed, other courts have already entered preliminary and permanent injunctions in challenges to materially identical bans on distribution of "violent" video games. *See IDSA*, 329 F.3d at 960 (reversing district court's refusal to enjoin ban on "violent" video games); *AAMA*, 244 F.3d at 580 (noting a "strong likelihood of ultimate victory," irreparable harm to the plaintiffs if the law were allowed to go into effect, and "the entirely conjectural nature of the benefits of the ordinance to the people of Indianapolis"); *Granholm*, 426 F. Supp. 2d at 656 (ordering permanent injunction after earlier preliminary injunction); *Schwarzenegger*, 401 F. Supp. 2d 1034 (N.D. Cal. 2005) (preliminary injunction); *Blagojevich*, 404 F. Supp. 2d 1051 (N.D. Ill. 2005) (permanent injunction); *Maleng*, 325 F. Supp. 2d at 1191 (permanent injunction following preliminary injunction). And Plaintiffs will suffer immediate and irreparable harm if the Act is allowed to going into effect. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," justifying the grant of injunctive relief. *Deerfield*, 661 F.2d at 338 (citing *Elrod*, 427 U.S. at 373); *see also Wexler*, 267 F. Supp. 2d at 568; *Jabr*, 171 F. Supp. 2d at 666.

## II. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS, GIVEN THE ACT'S SWEEPING CONTENT-BASED INVASION OF FIRST AMENDMENT RIGHTS AND UNCONSTITUTIONAL VAGUENESS.

### A. Video Games Depicting Violence Are Fully Protected By The First Amendment.

The courts have unequivocally held that video games constitute expression protected by the First Amendment. *IDSA*, 329 F.3d at 958 (video games "'are as much entitled to the protection of free speech as the best of literature'") (quoting *Winters v. New York*, 333 U.S. 507, 510 (1948)); *AAMA*, 244 F.3d at 577-78; *Granholm*, 426 F. Supp. 2d at 650-51 ("video games contain creative, expressive free speech, inseparable from their interactive functional elements, and are therefore protected by the First Amendment"); *Blagojevich*, 404 F. Supp. 2d at 1056 (video games are "one of the newest and most popular forms of artistic expression" and are "considered protected expression under the First Amendment"); *Maleng*, 325 F. Supp. 2d at 1184-85 (video games "are expressive and qualify for the protections of the First Amendment"); *see also James*, 300 F.3d at 695-96 (First Amendment protects the communicative aspects of video games). Indeed, video games convey "age-old themes of literature," messages, and ideologies, "just as books and movies do." *AAMA*, 244 F.3d at 577-78. Moreover, the Act's content-based restrictions themselves demonstrate that the targeted games constitute protected expression, because "it is the nature and effect of the message being communicated by these video games which prompted the state to act in this sphere." *Maleng*, 325 F. Supp. 2d at 1184.

That the Act restricts depictions of violence makes no difference as a matter of First Amendment scrutiny. Depictions of violence are entitled to full constitutional protection. *See IDSA*, 329 F.3d at 958 (strict scrutiny applies to content-based restrictions on "violent" video games); *AAMA*, 244 F.3d at 575-76 ("The notion of forbidding not violence itself, but pictures of violence, is a novelty"); *Maleng*, 325 F. Supp. 2d at 1186 (same); *Eclipse Enters., Inc. v.*

*Gulotta*, 134 F.3d 63, 66 (2d Cir. 1997) (declining to "expand the[] narrow categories of [unprotected] speech to include depictions of violence" in trading cards). Indeed, in the context of "violent" magazines, the Supreme Court has stated that violent expression is "as much entitled to the protection of free speech as the best of literature." *Winters*, 333 U.S. at 510.

### B. The Act's Content-Based Restrictions Fail Strict Scrutiny.

Because the Act restricts protected expression based on its content, it is subject to the most exacting First Amendment scrutiny. *See IDSA*, 329 F.3d at 958 ("Because the ordinance regulates video games based on their content . . . we review it according to a strict scrutiny standard."); *Granholm*, 426 F. Supp. 2d at 651-52; *Schwarzenegger*, 401 F. Supp. 2d at 1045; *Blagojevich*, 404 F. Supp. 2d at 1072; *Maleng*, 325 F. Supp. 2d at 1186. Such content-based regulation of expression is "presumptively invalid." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992). "It is rare that a regulation restricting speech because of its content will ever be permissible." *United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 818 (2000).

Under the strict scrutiny standard, the State must (1) articulate a compelling state interest; (2) prove that the Act actually serves that interest and is "necessary" to do so; and (3) show that the Act is narrowly tailored to serve that interest. *R.A.V.*, 505 U.S. at 395; *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 664-65 (1994); *Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.*, 502 U.S. 105, 118 (1991). The legislature's judgments are not to be accepted without question; rather, the legislature must have "drawn reasonable inferences based on substantial evidence." *Turner*, 512 U.S. at 666; *see also, e.g., VSDA*, 325 F. Supp. 2d at 1187-88. Moreover, the State "must do more than simply 'posit the existence of the disease sought to be cured.' It must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Turner*, 512 U.S.

at 664 (citation omitted). The State cannot satisfy its burden of establishing any of the prongs of the strict scrutiny standard.

### C. The State Cannot Show a Legitimate and Compelling Interest in Restricting Access to Games with "Violent" Content.

The Act fails strict scrutiny because the State cannot point to any legitimate and compelling interest that would support the Act's restrictions on protected speech. The Act suggests that the restrictions on video games are justified by the State's interest in preventing "physical" and "psychological" harm to minors. *See* Act, § 1. Neither of these purported interests satisfies the requirements of strict scrutiny.

As to the first purported interest, the State cannot meet the stringent standard for laws restricting speech in order to curb "violent" behavior. Any effort to justify the Act on the theory that disfavored content in video games will cause physical harm by inciting some players to act violently must meet the stringent standards of *Brandenburg v. Ohio*, 395 U.S. 444 (1969). *See Granholm*, 426 F. Supp. 2d at 653; *Blagojevich*, 404 F. Supp. 2d at 1073; *see also James*, 300 F.3d at 698 ("In protecting against the propensity of expression to cause violence, states may only regulate that speech" that meets the *Brandenburg* standard); *Herceg v. Hustler Magazine, Inc.*, 814 F.2d 1017, 1021-22 (5th Cir. 1987).

Under *Brandenburg*, the government must prove that the targeted expression "'is *directed to* inciting or producing *imminent* lawless action and is *likely* to incite or produce such action.'" *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 253 (2002) (quoting *Brandenburg*, 395 U.S. at 447) (emphasis added); *Herceg*, 814 F.2d at 1022; *James*, 300 F.3d at 698; *see also Dworkin v. Hustler Magazine, Inc.*, 867 F.2d 1188, 1199-1200 & n.8 (9th Cir. 1989) (*American Booksellers Ass'n v. Hudnut*, 771 F.2d 323, 329-30 (7th Cir. 1985), *aff'd*, 475 U.S. 1001 (1986). As the Supreme Court has explained, "the mere tendency of speech to encourage unlawful acts is not a

sufficient reason for banning it." *Free Speech Coalition*, 535 U.S. at 253; *cf. Johnson*, 491 U.S. at 408-09 ("fighting words" doctrine applies only to speech likely to provoke immediate breach of peace); *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942) (same). Thus, the government may not punish speakers based solely on a prediction or suspicion that their words will tend, in the aggregate, to encourage undesired behavior.

The Act comes nowhere near to satisfying the stringent *Brandenburg* standard. The Act is devoid of any legislative finding or underlying evidence that the video games covered by the Act are directed to and likely to cause imminent violent action. Nor could such a showing be made, as every court to have considered the issue has concluded. *See Blagojevich*, 404 F. Supp. at 1073; *Granholm*, 426 F. Supp. 2d at 651; *see also AAMA*, 244 F.3d at 576, 578-79; *James*, 300 F.3d at 690.

The Act's second stated interest – in preventing "psychological harm" to minors – is equally flawed. That interest is nothing more than an interest in controlling minors' thoughts – a wholly impermissible reason for restricting protected speech. The First Amendment forbids governmental restrictions on speech based on the provocative or persuasive effect of that speech on its audience. *See Boos v. Barry*, 485 U.S. 312, 321 (1988) (O'Connor, J.,) (striking ban on picketing near embassies where purpose was to protect the emotions of those who reacted to the picket signs' message); *Texas v. Johnson*, 491 U.S. at 408-09 (interest in protecting bystanders from feeling offended or angry is not sufficient to justify ban on expression). As the Supreme Court has noted, "First Amendment freedoms are most in danger when the government seeks to control thought or to justify its laws for that impermissible end." *Free Speech Coalition*, 535 U.S. at 253.

The government does not have a generalized power to limit minors' exposure to creative

works based on a belief that they may be "psychologically harmful."[2] *IDSA*, 329 F.3d at 959-960 ("[In no case] does the Supreme Court suggest that the government's role in helping parents to be the guardians of their children's well-being is an unbridled license to governments to regulate what minors read and view. . . . [T]he government cannot silence protected speech by wrapping itself in the cloak of parental authority."); *Blagojevich*, 404 F. Supp. 2d at 1076 (same). *Cf. AAMA*, 244 F.3d at 577 ("[There is] there is a serious "danger of allowing government to control the access of children to information and opinion," as "[p]eople are unlikely to become well-functioning, independent-minded adults and responsible citizens if they are raised in an intellectual bubble."). Thus, the State simply may not restrict video game expression merely because it dislikes the way that expression shapes individuals' thoughts and attitudes. *See Blagojevich*, 404 F. Supp. 2d at 1074 ("In this country, the State lacks the authority to ban protected speech on the ground that it affects the listener's or observer's thoughts and attitudes."). Accordingly, the Act cannot be defended on the grounds that it is designed to protect minors from some form of "psychological harm," as that amounts to nothing more than impermissible thought control.

The Act fails the first prong of the strict scrutiny analysis for the additional reason that there is no "substantial evidence" of a harm purportedly cured by the Act. *See Turner*, 512 U.S. at 664 (to withstand constitutional scrutiny, the government must demonstrate a compelling interest backed by "substantial evidence"). At the hearing on Plaintiffs' motion for a temporary restraining order, the State suggested that the legislative record contained evidence

---

[2] Like adults, minors have a First Amendment right to be free from content-based governmental regulation of the speech they utter or receive. *See, e.g., McConnell v. Federal Election Comm'n*, 540 U.S. 93, 231 (2003) ("Minors enjoy the protection of the First Amendment"); *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213-14 (1975); *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506-07, 511 (1969).

11

demonstrating that "violent" video games are harmful. That proposition has been rejected by every court to have reviewed such evidence, including three courts in the last seven months. *See, e.g., Blagojevich*, 404 F. Supp. 2d at 1073 (finding that the State had "come nowhere close" to showing that video games made minors more violent under *Brandenburg* and that it had "failed to present substantial evidence showing that playing violent video games causes minors to have aggressive feelings or engage in aggressive behavior"); *Granholm*, 426 F. Supp. 2d at 653 (holding that the State's evidence "falls far short of the 'substantial evidence' requirement needed to restrict free speech); *Schwarzenegger*, 401 F. Supp. 2d at 1046 (granting preliminary injunction and stating that this "court anticipates that the [State] may face similar problems to those [shown in other cases] proving the California legislature made 'reasonable inferences based on substantive evidence.'"); *IDSA*, 329 F.3d at 958 ("The County's conclusion that there is a strong likelihood that minors who play violent video games will suffer a deleterious effect on their psychological health is simply unsupported in the record."); *Maleng*, 325 F. Supp. 2d at 1188--89 ("[T]he Court finds that the Legislature's belief that video games cause violence, particularly violence against law enforcement officers, is not based on reasonable inferences drawn from substantial evidence."); *AAMA*, 244 F.3d at 578-79 ("The [government's] studies do not find that video games have ever caused anyone to commit a violent act, as opposed to feeling aggressive, or have caused the average level of violence to increase anywhere."). In light of the unbroken series of cases upholding constitutional challenges to similar laws – and rejecting the social science relied upon by the State – Plaintiffs have a high likelihood of prevailing on the merits, and a preliminary injunction should issue.

### D. The Act Does Not Materially Advance the State's Interests and Is Not Narrowly Tailored.

Even assuming that the State's justifications for the Act were not facially illegitimate and unsupported by evidence, the Act would still fail First Amendment scrutiny. First, the State would have to demonstrate that the Act's restrictions actually and materially address the alleged government interests. *See, e.g., Turner*, 512 U.S. at 664-65; *Maleng*, 325 F. Supp. 2d at 1189. Here, the fact that the State has singled out video games — even though a wide range of media make comparable violent expression available to minors — is strong evidence that the Act fails to advance the State's interests. *See, e.g., Florida Star v. B.J.F.*, 491 U.S. 524, 540 (1989) (the "facial underinclusiveness" of a regulation undermines the claim that the regulation serves its alleged interests). "Violent" video games "are a tiny fraction of the media violence to which modern American children are exposed." *AAMA*, 244 F.3d at 579. But the Act leaves these other media unaffected. *See Blagojevich*, 404 F. Supp. 2d at 1075 ("In fact, the underinclusiveness of this statute—given that violent images appear more accessible to unaccompanied minors in other media—indicates that regulating violent video games is not really intended to serve the proffered purpose."); *Granholm*, 426 F. Supp. 2d at 654. (Not only does the Act not materially advance the State's stated interests, but it appears to discriminate against a disfavored "newcomer" in the world of entertainment media. Thus, "singling out" the video game industry does not advance the State's alleged goals and therefore does not fulfill the strict scrutiny requirement."). Under the Act, for example, a minor could be legally barred from buying or renting an "M"-rated video game containing "violent" content, but that same minor could legally buy or rent the movie and book on which the video game was based. *Blagojevich*, 404 F. Supp. 2d at 1075 ("In fact, the underinclusiveness of this statute—given that violent images appear more accessible to unaccompanied minors in other media—indicates that

regulating violent video games is not really intended to serve the proffered purpose."); *see also* Price Decl. ¶¶ 4, 16, 32, 40 (noting similarities between M-rated games and many films and books).

Moreover, the Act fails strict scrutiny because it is not narrowly tailored. The narrow tailoring requirement requires the State to prove that "a plausible, less restrictive alternative" to banning such games "will be ineffective to achieve its goals." *Playboy*, 529 U.S. at 816. The State cannot make such a showing here, where such alternative exists, including encouraging awareness of the voluntary ESRB video game rating system (which provides guidance to parents and other consumers), and the availability of parental controls that allow each household to determine which games their children can play. *See Playboy*, 529 U.S. at 824-25 ("A court should not assume a plausible, less restrictive alternative would be ineffective; and a court should not presume parents, given full information, will fail to act."); *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 507-08 (1996) (plurality op.) (striking down ban on advertising alcohol prices because of less restrictive alternatives, such as an "educational campaign" or "counterspeech"); *Ashcroft*, 542 U.S. at 671-72 (noting that rapid technological developments may create alternatives displacing the rationale for imposing speech restrictions). The State cannot meet its burden of demonstrating the absence of less restrictive alternatives where it declined Plaintiffs' offer to work with it to help educate consumers about the well-established and comprehensive ESRB system, and instead proceeded to adopt the Act's restrictive measures. *See* Lowenstein Decl. ¶¶ 15-18.

### E. The Act Is Unconstitutionally Vague.

The Act is unconstitutional on an independent ground: vagueness. Because several of the Act's key terms are impermissibly vague and place the burden of compliance on game retailers, the Act will restrict a far broader range of expression than even the State claims it is

seeking to regulate. The Constitution demands that statutes be set forth with "sufficient definiteness that ordinary people can understand what conduct is prohibited." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). Such precision is essential to "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). In particular, exacting precision is required of restrictions in the context of protected expression. *See Reno*, 521 U.S. at 871-72 (explaining that the vagueness of a "content-based regulation of speech," particularly one imposing criminal penalties, "raises special First Amendment concerns because of its obvious chilling effect on free speech"); *NAACP v. Button*, 371 U.S. 415, 433 (1963).

The Act's definition of a prohibited "violent" video game fails to give reasonable notice of what conduct is prohibited. The vague terms include, but are not limited to: "the minor's morbid interest in violence," depictions of violence that are "patently offensive to prevailing standards in the community as to what is suitable for minors," and games which lack "serious literary, artistic, political, or scientific value for minors." The State has apparently attempted to harness the standard for sexual obscenity in the context of violent video games, but the "'harmful to minors' standard for sexually explicit speech cannot be expanded to cover depictions of violence." *Granholm*, 426 F. Supp. 2d at 655-56. Instead, as *Granholm* held, such terms have no clear meaning in the context of violent video games. *Id*; Price Decl. ¶¶ 8-14, 24, 31, 39, 47, 52, 58; Andersen Decl. ¶¶ 13-16; *see also Video Software Dealers Ass'n v. Webster*, 968 F.2d 684, 690 (8th Cir. 1992) (affirming district court's conclusion that statute lacks requisite specificity because, *inter alia*, term "morbid" was not defined); *cf. Winters*, 333 U.S. at 513, 518-19 (striking down as vague a statute prohibiting the distribution of tales of criminal deeds of bloodshed and lust "so massed as to become vehicles for inciting violent and depraved crimes

against the person" and appealing "to that portion of the public who (as many recent records remind us) are disposed to take to vice for its own sake"). Indeed, unlike the existing harmful to minors statute, which defines the sexual depictions that are subject to its provisions, the Act provides no definition for "violence."

Because of its vague terms, persons of ordinary intelligence are forced to guess at the meaning and scope of the Act. And because video games offer the player a wide range of possible game play of significant duration, retailers would be expected to review the entire possible course of play in a particular game to ensure that the game does not violate the Act. *See* Andersen Decl. ¶ 11; *see also* Price Decl. ¶ 13. "The lack of precision among these definitions will subject [Louisiana] retailers to steep . . . criminal liability if they guess wrongly about what games the Act covers. Retailers will respond by either self censoring or otherwise restricting access to any potentially offending video game title." *Granholm*, 426 F. Supp. 2d at 656; *Blagojevich*, 404 F. Supp. 2d at 1077 ("[T]his [vague] this definition leaves video game creators, manufacturers, and retailers guessing about whether their speech is subject to criminal sanctions."); *Maleng*, 325 F. Supp. 2d at 1191 ("The problem is not . . . that a retail clerk may be unaware of the contents of a particular game. . . . The real problem is that the clerk might know everything there is to know about the game and yet not be able to determine whether it can be legally sold to a minor."). Such understandable, self-protective behavior will deprive access to such expression not just to minors, but to adult customers as well—who unquestionably have the right to access the video games covered by the Act. *See* Lowenstein Decl. ¶ 13; Andersen Decl. ¶¶ 8-9, 15; Price Decl. ¶¶ 14.

### III. THE EQUITIES STRONGLY SUPPORT A PRELIMINARY INJUNCTION.

Not only have Plaintiffs demonstrated a virtually certain likelihood of success on the merits, but the other prerequisites to temporary injunctive relief are easily met here. Entering a

preliminary injunction would plainly serve the public interest and would not harm Defendants' legitimate interests. Plaintiffs, their members, and willing listeners will all suffer irreparable harm if the Act's restriction of protected expression goes into effect. Lowenstein Decl. ¶ 13; Andersen Decl. ¶ 5. As the Supreme Court has made clear, the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod*, 427 U.S. at 373; *see also Ingebretson*, 88 F.3d at 280; *Deerfield*, 661 F.2d at 338; *New Orleans Secular Humanist Ass'n, Inc. v. Bridges*, 2006 WL 1005008, *5 (E.D. La.); *Wexler*, 267 F. Supp. 2d at 568. In the First Amendment context, the irreparable injury "stems from the intangible nature or the benefits flowing from the exercise of those rights; and the fear that, if these rights are not jealously safeguarded, persons will be deterred, even if imperceptibly, from exercising those rights in the future." *United Food & Commercial Workers Union, Local 1099 v. Southwest Ohio Regional Transit Authority* ("SORTA"), 163 F.3d 341, 363 (6th Cir. 1998) (internal quotation marks omitted). Thus, no adequate remedy at law exists for Plaintiff's claims. *See, e.g., Jabr*, 171 F. Supp. 2d at 666; *National People's Action v. Village of Wilmette*, 914 F.2d 1008, 1013 (7th Cir. 1990) ("[I]njunctions are especially appropriate in the context of first amendment violations because of the inadequacy of money damages.").

Finally, the balance of equities (including the public interest) weighs heavily in favor of a preliminary injunction. The public interest would be harmed if the Act were allowed to go into effect. *See Wexler*, 267 F. Supp. 2d at 568-69 (holding that "[t]he public interest is best served by enjoining the effect of any ordinance which limits potentially constitutionally protected expression until it can be conclusively determined that the ordinance withstands constitutional scrutiny."). The enforcement of the Act will not only affect Plaintiffs, but will affect countless video game creators, retailers, and consumers throughout Louisiana and beyond, all of whom

17

Case 3:06-cv-00431-JJB-CN   Document 11-2   06/20/2006   Page 17 of 19

will suffer infringements on their constitutional right to produce and view the expression contained in the wide array of video games implicated here. By contrast, "there can be no irreparable harm to a [government] when it is prevented from enforcing an unconstitutional statute because 'it is always in the public interest to protect First Amendment liberties.'" *Joelner v. Village of Washington Park*, 378 F.3d 613, 620 (7th Cir. 2004) (quoting *Connection Distrib. Co*, 154 F.3d at 288); *see also Ingebretson*, 88 F.3d at 280; *ACLU v. Foster*, 2002 WL 1733651, *2 (E.D. La.) ("The threatened injury to the plaintiffs in this matter far outweighs the threatened injury to the defendants because constitutional rights are at stake."). The equities compel a temporary restraining order here.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court grant a preliminary injunction, enjoining Defendants from enforcing the Act until a final ruling (including any appeals) on Plaintiffs' constitutional claims.

Respectfully submitted,

*[signature]*

James A. Brown, T.A. (Bar #14101)
George Denegre, Jr. (Bar #8387)
LISKOW & LEWIS
One Shell Square
701 Poydras Street, Suite 5000
New Orleans, LA 70139-5099
Telephone: (504) 581-7979
Facsimile: (504) 556-4108

Attorneys for Entertainment Software Association
and Entertainment Merchants Association

Of Counsel:

Paul M. Smith
Katherine A. Fallow
Matthew S. Hellman
JENNER & BLOCK LLP
601 13th Street, NW, Suite 1200
Washington, DC 20005
Telephone: (202) 639-6000
Facsimile: (202) 639-6066

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the above and foregoing pleading has been served upon Charles C. Foti, Jr., in his official capacity as Attorney General of the State of Louisiana and Doug Moreau, in his official capacity as District Attorney for the Parish of Baton Rouge, by Federal Express this 20th day of June 2006.

*[signature]*

626256_1.DOC

19

Case 3:06-cv-00431-JJB-CN    Document 11-2    06/20/2006    Page 19 of 19