IN THE UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| ENTERTAINMENT SOFTWARE ASSOCIATION AND ENTERTAINMENT MERCHANTS ASSOCIATION, | * * * * | |
| Plaintiffs, | * * | CIVIL ACTION NO. 06-431-JJB-CN |
| vs. | * * * | |
| CHARLES C. FOTI, JR., in his official capacity as Attorney General of the State of Louisiana; and DOUG MOREAU, in his official capacity on behalf of himself as District Attorney for the Parish of East Baton Rouge, and on behalf of a class of similarly situated individuals in their official capacities, | * * * * * * * * * | SECTION "D"<br><br>Judge James J. Brady |
| Defendants. | * | |

## DECLARATION OF CROSSAN R. ANDERSEN

Pursuant to 28 U.S.C. § 1746, I, Crossan R. Andersen, under penalty of perjury state as follows:

1. I am employed as President of the Entertainment Merchants Association ("EMA"), a not-for-profit international trade association dedicated to advancing the interests of the $32 billion home entertainment industry. The EMA was established in April 2006 through the merger of the Video Software Dealers Association ("VSDA") and the Interactive Entertainment Merchants Association ("IEMA"). EMA represents more than 1,000 companies throughout the United States, Canada, and other nations. Its members operate more than 20,000 retail outlets in the United States, including approximately 250 in Louisiana, that sell and/or rent DVDs and computer and console video games. The

1

EXHIBIT 2

membership comprises the full spectrum of retailers (from single-store specialists to multi-line mass merchants), distributors, the home video divisions of major and independent motion picture studios, and other related businesses that constitute and support the home entertainment industry. Previously I served as Senior Vice President and General Counsel, and later President, of the VSDA.

2. I am admitted to practice in the State of California. I have previously served as a Trial Attorney for the United States Department of Justice, Antitrust Division (1971-1980), and as an Assistant United States Attorney for the Central District of California (1980-1988). From 1988 to 1995, I was employed as counsel to the Motion Picture Association of America.

3. As President of EMA, I am called upon to represent the interests of EMA, its members, and the home entertainment distribution and retailing industry in general, including the distribution and retailing of computer and console video games and other packaged video products. This regularly includes representation in consumer and trade media, at conventions and other trade events and before federal and state governments and international trade organizations. I have personal knowledge of the facts stated in this declaration.

4. In my capacity as President of EMA, I have remained informed concerning the issues and process concerning the recently enacted R.S. 14:91.14 (the "Act"), which was signed into law on June 15, 2006 and was to be effective immediately. The Act criminalizes the sale or rental of video games based solely on their expressive content. The Act makes it illegal for anyone in Louisiana to sell, lease, or rent to anyone under the age of 18 a

2

"violent" video game, as defined by the Act, and imposes severe criminal sanctions for violations thereof.

5. By imposing criminal penalties based on the content of certain video games, the Act will interfere with the rights of EMA's members to disseminate video game expression to willing customers, whose freedom to receive constitutionally protected speech will also be abridged. The severity of the criminal sanctions available under the Act will inevitably cause retailers to choose not to stock games which contain depictions of violence in order to avoid exposing their employees to criminal sanctions, including imprisonment. In this manner the Act will chill and suppress sales and rentals of video games containing depictions of violence to minors and adults alike.

6. The Act imposes criminal penalties even for inadvertent or unwitting sales or rentals of "violent" video games. Thus, retailers cannot rely on the presentation of age-verifying documents – which may be false or altered, though not readily detectable. Some retailers will choose not to stock games containing depictions of violence to avoid exposing themselves and their sales associates (employees) to criminal prosecution for such inadvertent violations involving neither negligence nor bad faith.

7. The Act's restrictions are inconsistent with current video game ratings and retailers' established voluntary business practices designed to guide and assist parents to make informed choices about the what content is appropriate for the maturity and sophistication of their children. EMA and its predecessors, VSDA and IEMA, have long supported widespread voluntary use of the Entertainment Software Rating Board ("ESRB") rating system, encouraging all retailers to use it (for example, by voluntarily choosing to not rent or sell AO-rated games to minors under 18 at all, and to provide minors under 17

3

with M-rated games only with parental consent), and to prominently display consumer information concerning the ESRB rating system in their stores. EMA and its members have together invested thousands of dollars developing awareness of the ESRB rating system and seeking its acceptance by consumers as a useful guide, attempting to give it the same level of public awareness and acceptance as is enjoyed by the familiar Motion Picture Association of America's ratings for movies, which are wholly voluntary.

8. Under the ESRB rating system, games rated M are suggested to be appropriate for individuals 17 and older. But the Act has the effect of suppressing or chilling sales and rentals to 17-year-olds of M-rated games which contain depictions of violence. This confusion with the industry's voluntary age-based informational standards for M-rated games will likely cause retailers to sell and rent M-rated games only to adults, whether or not the games contain proscribed depictions of violence. The Act would thus interfere with the rights of EMA's members to sell and rent video games to willing customers, and would interfere with their customers' right to purchase them.

9. Some member retailers have invested in and installed as components of their customer accounts contractual agreements with parent-account holders by which parents choose varying ratings as appropriate for their children and specifically authorize the retailer to sell or rent movies and video games to their children in a manner consistent with the contractual agreement. The Act inhibits retailers from honoring the specific instruction or authorization of a minor's parent or guardian to rent or sell a game containing depictions of violence to his or her child. The Act has the effect of interfering with such agreements and the established relationship between the retailer and both adult and authorized minor customers.

4

10. Under the Act, no person may sell or rent a video game if it depicts violence in a manner that "appeals to the minor's morbid interest in violence," is "patently offensive to prevailing standards in the adult community with respect to what is suitable for minors," and lacks value for minors. Act, § 2.

11. I have been involved in attempting to determine what the Act means and what EMA's members would have to do to be in compliance with the Act. In order for EMA's members to comply with the Act, they must review their present inventories and attempt to determine which video game titles might come within the coverage of the Act. Moreover, retailers and distributors must make guesses about the content of video games not yet released but which, by custom and trade practice, are ordered in advance of the release of the game. In internal consultations among EMA's leadership and members, it has become apparent that no consensus exists or could reasonably be deduced as to the scope of the Act's reach and no clear criteria in the Act provide a useful guide to the decision-making called for by the Act.

12. While the EMA and its member retailers and distributors can try to guess which video games might be covered by the Act, it is impossible for EMA's members to determine with any degree of certainty whether any number of the titles in their inventories are covered by the Act. In the context of virtual fictional depictions featured in most games, the terms used in the Act to define proscribed content are vague and without definite meaning.

13. For example, the Act imposes on retailers the burden of determining whether a particular video game, taken as a whole, appeals to a "minor's morbid interest in violence." This provision does not assist retailers – who are at risk of criminal sanctions for

5

misinterpreting this element of the Act – in determining what games must not be sold or rented to minors. The definitional term "morbid" has a wide range of meanings ranging from *"of, relating to, or characteristic of disease"* to *"abnormally susceptible to or characterized by gloomy or unwholesome feelings."* Webster's Third International Dictionary, 1971. Given the range of definitions of this term, the Act fails to give retailers fair notice of what speech is to be suppressed for minors.

14. Retailers have no reasonable basis to know the meaning of many terms in the Act and thus do not have a reasonable opportunity to understand what games are restricted by the Act. Retailers carry the burden of compliance with the vague terms of the Act and, out of understandable abundance of caution to avoid criminal sanctions, will restrict a much broader range of expression than finders of fact in the state may find fit the Act's vague and subjective language. Video games involve only computer-generated and inherently unrealistic depictions, often featuring cartoon or fanciful characters. Retailers cannot know with a reasonable degree of certainty how such characters will appeal to various interests of minors, much less minors' morbid interest in violence, even if the term "morbid" could be understood in this context.

15. Moreover, the interactive element of modern video games is often so advanced that players may have substantial control over the "virtual personalities" of their game characters, such that it is the player's actions, not those of the game publisher, that ultimately determine whether the game falls within the definition set forth in the Act. With such variability in how a game may be played and with such inherent variability in how it might appeal to a minor, retailers' only choice is to engage in self-protective

6

behavior and restrict the number and types of games they offer – and perhaps choosing to stock almost no games containing depictions of violence.

16. With respect to the term "depicts violence in a manner patently offensive to prevailing standards in the adult community," retailers do not know how to identify "prevailing standards" regarding depictions of violence. In the context of fictionalized actions by unreal characters, retailers' experience is that adults have widely differing views on what depictions of violence are inappropriate for minors and there is no broad consensus on which they can rely which they can use as a guide for avoiding liability under the Act. Moreover, it would be expensive and burdensome for retailers to be required to conduct studies or tests to develop empirical evidence of such prevailing standards, if any existed, as to what virtual fictional depictions of violence are suitable for minors. Instead of bearing this cost, most retailers likely would decide not to stock any games with violent content, absent any guide for avoiding liability under the Act.

17. Retailers and their sales associates will be exposed to criminal prosecution, a criminal record, fines and even imprisonment if they guess incorrectly about what games the Act covers, and/or even how a given customer may interact with the game. Retailers and their sales associates will inevitably respond to the uncertainty in the Act, and the Act's severe penalties, by either self-censoring, thereby abridging the freedom of speech of all of their customers, or otherwise restricting access to any video game containing depictions of violence, thereby abridging the freedom of speech of their under-age customers. Because of the serious criminal liability visited upon retailers for failing to guess correctly as to scope of the Act, retailers in Louisiana would have no choice but to carve out a broad zone of protection and sweep into the category video games they do not

7

Case 3:06-cv-00431-JJB-CN    Document 11-4    06/20/2006    Page 7 of 9

reasonably believe any parent would object to, but which nevertheless might fit a prosecutor's interpretation of Section 91-14(A) of the Act.

18. While the Act was being considered, the EMA informed both the Legislature and the Governor about the Act's constitutional infirmities. The EMA also informed the Legislature and the Governor about the numerous policies and practices employed by EMA's members to enforce voluntarily the ESRB rating system and the existence of less restrictive alternatives to the Act, offering to work with the State on a public education campaign concerning the ESRB system.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED on June 2, 2006.

*[signature]*
Crossen R. Andersen