IN THE UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

| ENTERTAINMENT SOFTWARE ASSOCIATION AND ENTERTAINMENT MERCHANTS ASSOCIATION, | * |  |
|---|---|---|
| Plaintiffs, | * | CIVIL ACTION NO. 06-431-JJB-CN |
| vs. | * |  |
| CHARLES C. FOTI, JR., in his official capacity as Attorney General of the State of Louisiana; and DOUG MOREAU, in his official capacity on behalf of himself as District Attorney for the Parish of East Baton Rouge, and on behalf of a class of similarly situated individuals in their official capacities, | * | SECTION "D"<br><br>Judge James J. Brady |
| Defendants. | * |  |

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

I.   INTRODUCTION

Plaintiffs Entertainment Software Association ("ESA") and Entertainment Merchants Association ("EMA") submit this memorandum in support of their motion, pursuant to Federal Rule of Civil Procedure 56, for summary judgment in their favor and entry of a declaratory judgment and a permanent injunction preventing enforcement of La. R.S. 14:91.14 (hereinafter, the "Act"). On June 16, 2006, the Court temporarily enjoined enforcement of the Act, and on August 24, 2006, the Court entered a preliminary injunction against Defendant District Attorney Doug Moreau enjoining enforcement of the Act. Plaintiffs now respectfully request that the Court grant summary judgment to Plaintiffs, and issue a declaratory judgment finding the Act unconstitutional and permanently enjoin enforcement of the Act.

Dockets.Justia.

Plaintiffs are entitled to summary judgment on their constitutional claims as a matter of law.[1] Indeed, the Court found in favor of Plaintiffs' key arguments in its August 24, 2006 Order granting a preliminary injunction and finding that Plaintiffs were likely to succeed on the merits of their constitutional claims (the "PI Order"). And in fact, every previous government attempt to restrict "violent" video games has been struck down as violating the First Amendment. *See Interactive Digital Software Ass'n v. St. Louis County*, 329 F.3d 954 (8th Cir. 2003) (*"IDSA"*); *American Amusement Mach. Ass'n v. Kendrick*, 244 F.3d 572 (7th Cir.), *cert. denied*, 534 U.S. 994 (2001) (*"AAMA"*); *Entertainment Software Ass'n v. Hatch*, -- F. Supp. 2d --, No. 06-CV-2268 (JMR/FLN), 2006 WL 2162302 (D. Minn. July 31, 2006) (*"Hatch"*); *Entertainment Software Ass'n v. Granholm*, 426 F. Supp. 2d 646 (E.D. Mich. 2006) (*"Granholm"*); *Video Software Dealers Ass'n v. Schwarzenegger*, 401 F. Supp. 2d 1034 (N.D. Cal. 2005) (*"Schwarzenegger"*) (preliminary injunction); *Entertainment Software Ass'n v. Blagojevich*, 404 F. Supp. 2d 1051 (N.D. Ill. 2005) (*"Blagojevich"*); *Video Software Dealers Ass'n v. Maleng*, 325 F. Supp. 2d 1180 (W.D. Wash. 2004) (*"Maleng"*); *see also James v. Meow Media, Inc.*, 300 F.3d 683 (6th Cir. 2002) (*"James"*) (rejecting attempts to impose tort liability on "violent" video games as inconsistent with the First Amendment); *Sanders v. Acclaim Entm't, Inc.*, 188 F. Supp. 2d 1264 (D. Colo. 2002) (same); *Wilson v. Midway Games, Inc.*, 198 F. Supp. 2d 167 (D. Conn. 2002) (same).

As the PI Order indicated, Louisiana's law is no different from its unconstitutional predecessors. The Act imposes a content-based restriction on video games by regulating games that depict violence in a certain way. PI Order at 12-13. This restriction must satisfy strict

---

[1] In addition to the arguments herein, Plaintiffs also incorporate their arguments included in their Motion for Preliminary Injunction and rely on the Declarations and exhibits attached to their motion, including the Declarations of Crossan R. Andersen, Douglas Lowenstein, and Ted Price. Plaintiffs at this time do not move for summary judgment on their equal protection claim.

scrutiny, a standard that the State cannot come close to meeting. *Id.* at 13-14. The purpose of the Act is to control the thoughts or "psychology" of minors – which is not even a legitimate, much less compelling, government interest. *Id.* at 15-16. Even if it were, the State cannot point to any "substantial evidence" supporting its claim that the video games restricted by the Act cause harm to minors. *Id.* at 16-18. Further, because it singles out video games from other media containing violence and ignores the presence of less restrictive means to empower parents and consumers to make educated decisions concerning video games, the Act fails the other prongs of strict scrutiny. *Id.* at 18-20. The Act's constitutional infirmities are compounded by its inherently vague terms. Retailers, facing criminal sanctions for violating the Act, will choose to self-censor and avoid any game that could conceivably run afoul of the Act. *Id.* at 24-26. The result will be that large swaths of constitutionally protected expression will be unavailable to adults and minors alike.

As discussed in the PI Order, the current record establishes these constitutional infirmities and there is no reason to think that this case is different from all of the other decisions striking down similar laws: the Act's rationales are equally flawed; the evidence supporting the Act is equally nonexistent; and the Act's chilling effect is equally pernicious. Because the law is clear and the material facts are not in dispute, Plaintiffs respectfully ask for summary judgment, entry of a declaratory judgment, and a permanent injunction against enforcement of the Act.

## II. BACKGROUND

### A. First Amendment Protection for Video Game Expression.

Plaintiffs are associations of companies that create, publish, distribute, sell, and/or rent console and computer video games (hereinafter "video games"). Lowenstein Decl. ¶ 2;

Andersen Decl. ¶ 1.[2] The Act, if allowed to go into effect, will result in censorship and limit the distribution of some of these creative works, based solely upon their expressive content. Lowenstein Decl. ¶ 13; Andersen Decl. ¶¶ 5-6; PI Order at 4-5. In this facial challenge, Plaintiffs also assert the rights of willing listeners. Compl. ¶ 13.

Video games are a modern form of artistic expression. Like motion pictures and television programs, video games tell stories and entertain audiences through the use of complex pictures, sounds, and text. Price Decl. ¶¶ 3-4. These games often contain storylines and character development as richly detailed as (and sometimes based on) books and movies. *Id.* ¶¶ 3-4, 20, 32, 54. Like great literature, these games often involve themes such as good versus evil, triumph over adversity, struggle against corrupt powers, and quest for adventure. *Id.* ¶¶ 4, 18-61. The courts are unanimous in holding that the content of video games is fully protected by the First Amendment. *See IDSA*, 329 F.3d at 958; *AAMA*, 244 F.3d at 577-78; *James*, 300 F.3d at 695-96; *Hatch*, 2006 WL 2162302, at *2; *Granholm*, 426 F. Supp. 2d at 650-651; *Schwarzenegger*, 401 F. Supp. 2d at 1044; *Blagojevich*, 404 F. Supp. 2d at 1056; *Maleng*, 325 F. Supp. 2d at 1184-85.

### B. The Video Game Industry's Voluntary Rating System.

Like other popular media, such as motion pictures, television, and music, the video game industry has adopted a voluntary and widely used rating system for video games. *See* Lowenstein Decl. ¶¶ 4-10. That system — which the Federal Trade Commission has called the "most comprehensive" of industry-wide media rating systems — is implemented by the

---

[2] Throughout this Memorandum, "Andersen Decl." refers to the Declaration of Crossan R. Andersen, President of Plaintiff EMA, "Lowenstein Decl." refers to the Declaration of Douglas Lowenstein, President of Plaintiff ESA, and "Price Decl." refers to the Declaration of Ted Price, President and CEO of Insomniac Games, Inc., all attached as exhibits to Plaintiffs' Motion for Preliminary Injunction.

Entertainment Software Rating Board ("ESRB"), a self-regulatory body that assigns independent ratings and descriptions for video game content. *Id.* ¶¶ 4-6. The ESRB gives one of six age-specific ratings to each game it rates: EC (Early Childhood); E (Everyone); E10+ (Everyone 10 and older); T (Teen); M (Mature); AO (Adults Only). The ESRB also assigns content descriptors to the game, such as "Cartoon Violence," "Crude Humor," "Fantasy Violence," "Mild Violence," and "Strong Language." *Id.* ¶ 9.

The purpose of the ESRB system is to provide easily understood information about games to consumers and parents — not to dictate what is ultimately appropriate for individuals of different ages. *Id.* ¶ 6. Like the movie rating system, the ESRB system is entirely voluntary; nonetheless, essentially all video game publishers submit their games for rating. *Id.* ¶ 7. Similarly, video game retailers throughout the nation are part of a widespread and voluntary effort to educate consumers about the ESRB system and to restrict the sale of "M" games to individuals under age 17. *Id.* ¶¶ 7-8 & Ex. A.

### C. The Challenged Statute.

The Act makes it a crime to sell, lease or rent a prohibited "interactive video or computer game" to a minor. Act, § 91.14(A). A person who violates this Act "shall be fined not less than one hundred dollars nor more than two thousand dollars or imprisoned, with or without hard labor, for not more than one year, or both." *Id.* § 91.14(B)(3). A minor is defined as a person under 18 years of age. *Id.* "Interactive video or computer game" means "an object or device that stores recorded data or instructions, receives data or instructions generated by a person who uses it and by processing the data or instructions, creates an interactive game capable of being played or viewed on or through a computer, gaming system, console, or other technology." *Id.* § 91.14(B)(1).

The video games proscribed by the Act are those that meet all of the following criteria:

(1) The average person, applying contemporary community standards, would find that the video or computer game, taken as a whole, appeals to the minor's morbid interest in violence.

(2) The game depicts violence in a manner patently offensive to prevailing standards in the adult community with respect to what is suitable for minors.

(3) The game, taken as a whole, lacks serious literary, artistic, political, or scientific value for minors.

Act, § 91.14(A).

The Act's stated purposes for its restrictions on "violent" video games are: "that children are the most precious resource of this state and they are worthy of special protection from their government" and that the State has an interest in protecting minors from "physical, psychological, and financial harm." Act, § 1(a).

The Act was signed into law on June 15, 2006. On June 16, 2006, Plaintiffs filed their Complaint and successfully requested that the Court enter a temporary restraining order enjoining enforcement of the Act. On June 20, 2006, Plaintiffs then moved for a preliminary injunction enjoining enforcement of the Act until resolution of this action. On August 24, 2006, the Court granted the motion and preliminarily enjoined District Attorney Moreau from enforcing the Act, and directed the Plaintiffs to submit a motion for class certification in order to bind a defendant class of all District Attorneys in the State of Louisiana.

## III. LEGAL STANDARD

"Summary judgment is appropriate where the record shows 'that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Whiting v. Univ. of So. Miss.*, 451 F.3d 339, 343 (5th Cir. 2006) (quoting Fed. R. Civ. 56(c)). Here, the State carries the burden of proof to establish that the Act passes First Amendment scrutiny. *See, e.g., United States v. Playboy Entm't Group*, 529 U.S. 803, 816-17 (2000). To survive Plaintiffs' summary judgment motion, the State must come forward with sufficient

evidence to create a genuine issue of material fact on each and every "element essential to [its] case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A court must "view[] the evidence in a light most favorable to the non-movant." *Piazza's Seafood World, LLC, v. Odom*, 448 F.3d 744, 752 (5th Cir. 2006). However, "[t]he non-movant must go beyond the pleadings and come forward with specific facts indicating a genuine issue for trial to avoid summary judgment." *Id.*

## IV. ARGUMENT

### A. The Act's Sweeping Content-Based Restrictions on Protected Speech Violate The First Amendment.

#### 1. Video Games Depicting Violence Are Fully Protected by The First Amendment.

The courts have unequivocally held that video games constitute expression protected by the First Amendment. PI Order at 11-12; *IDSA*, 329 F.3d at 958 (video games "'are as much entitled to the protection of free speech as the best of literature'") (quoting *Winters v. New York*, 333 U.S. 507, 510 (1948)); *AAMA*, 244 F.3d at 577-78; *Hatch*, 2006 WL 2162302 at *2 ("video games are a protected form of speech under the First Amendment"); *Granholm*, 426 F. Supp. 2d at 650-51 ("video games contain creative, expressive free speech, inseparable from their interactive functional elements, and are therefore protected by the First Amendment"); *Blagojevich*, 404 F. Supp. 2d at 1056 (video games are "one of the newest and most popular forms of artistic expression" and are "considered protected expression under the First Amendment"); *Maleng*, 325 F. Supp. 2d at 1184-85 (video games "are expressive and qualify for the protections of the First Amendment"); *see also James*, 300 F.3d at 695-96 (First Amendment protects the communicative aspects of video games). Moreover, the Act's content-based restrictions themselves demonstrate that the targeted games constitute protected expression, because "it is the nature and effect of the message being communicated by these video games which prompted the state to act in this sphere." *Maleng*, 325 F. Supp. 2d at 1184. *See* PI Order

at 12.

That the Act restricts depictions of violence makes no difference as a matter of First Amendment scrutiny. Depictions of violence are entitled to full constitutional protection. *See* PI Order at 12-13; *IDSA*, 329 F.3d at 958 (strict scrutiny applies to content-based restrictions on "violent" video games); *AAMA*, 244 F.3d at 575-76 ("The notion of forbidding not violence itself, but pictures of violence, is a novelty"); *Maleng*, 325 F. Supp. 2d at 1186 (same); *Eclipse Enters., Inc. v. Gulotta*, 134 F.3d 63, 66 (2d Cir. 1997) (declining to "expand the[] narrow categories of [unprotected] speech to include depictions of violence" in trading cards). Indeed, in the context of "violent" magazines, the Supreme Court has stated that violent expression is "as much entitled to the protection of free speech as the best of literature." *Winters*, 333 U.S. at 510.

### 2. The Act's Content-Based Restrictions Fail Strict Scrutiny.

Because the Act restricts protected expression based on its content, it is subject to the most exacting First Amendment scrutiny. *See* PI Order at 13-14; *IDSA*, 329 F.3d at 958 ("Because the ordinance regulates video games based on their content . . . we review it according to a strict scrutiny standard."); *Hatch*, 2006 WL 2162302 at *2; *Granholm*, 426 F. Supp. 2d at 651-52; *Schwarzenegger*, 401 F. Supp. 2d at 1045; *Blagojevich*, 404 F. Supp. 2d at 1072; *Maleng*, 325 F. Supp. 2d at 1186. Such content-based regulation of expression is "presumptively invalid." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992). "It is rare that a regulation restricting speech because of its content will ever be permissible." *United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 818 (2000).

Under the strict scrutiny standard, the State must (1) articulate a compelling state interest in restricting speech; (2) prove that the Act actually serves that interest and is "necessary" to do so; and (3) show that the Act is narrowly tailored to serve that interest. PI Order at 14; *R.A.V.*, 505 U.S. at 395; *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 664-65 (1994); *Simon &*

*Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.*, 502 U.S. 105, 118 (1991). The legislature's judgments are not to be accepted without question; rather, the legislature must have "drawn reasonable inferences based on substantial evidence." *Turner*, 512 U.S. at 666; *see also, e.g.*, *Hatch*, 2006 WL 2162302, at *3; *VSDA*, 325 F. Supp. 2d at 1187-88. Moreover, the State "must do more than simply 'posit the existence of the disease sought to be cured.' It must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Turner*, 512 U.S. at 664 (citation omitted). The State cannot satisfy its burden of establishing any of the prongs of the strict scrutiny standard.[3]

### a) The State Cannot Show a Legitimate and Compelling Interest in Restricting Access to Games with "Violent" Content.

The Act fails strict scrutiny because the State cannot point to any legitimate and compelling interest that would support the Act's restrictions on protected speech. The Act suggests that the restrictions on video games are justified by the State's interest in preventing "physical" and "psychological" harm to minors. *See* Act, § 1.[4] In its PI Order, the Court addressed both of these purported interests and properly concluded that neither satisfies the requirements of strict scrutiny.

---

[3] In his Response to Plaintiffs' Motion for Preliminary Injunction, the Attorney General advanced the argument that the Act should be interpreted as requiring a preliminary judicial determination before a prosecution could proceed under the Act. The Court has already held that this reading of the Act is implausible, PI Order at 20-21, and that at any rate a preliminary judicial determination would still have the effect of suppressing speech on the basis of its content and chilling the speech of developers and retailers pending the outcome of any game-by-game judicial review. *Id.* at 21-22. Likewise, even with a judicial determination, manufacturers and retailers will be unable to understand the statute's vague and unclear terms in advance of a ruling and protected speech will be chilled. PI Order at 22, 25-26; *infra* Part II.

[4] The Act also purports to prevent a "financial" harm to minors, but there is no independent basis for this rationale apart from repackaging what the State considers to be "physical" and "psychological" harms to minors from violent video games.

As to the first purported interest, the State cannot meet the stringent standard for laws restricting speech in order to curb "violent" behavior. Any effort to justify the Act on the theory that disfavored content in video games will cause physical harm by inciting some players to act violently must meet the stringent standards of *Brandenburg v. Ohio*, 395 U.S. 444 (1969). *See* PI Order at 14-15; *Granholm*, 426 F. Supp. 2d at 653; *Blagojevich*, 404 F. Supp. 2d at 1073; *see also James*, 300 F.3d at 698 ("In protecting against the propensity of expression to cause violence, states may only regulate that speech" that meets the *Brandenburg* standard); *Herceg v. Hustler Magazine, Inc.*, 814 F.2d 1017, 1021-22 (5th Cir. 1987).

Under *Brandenburg*, the government must prove that the targeted expression "'is *directed to* inciting or producing *imminent* lawless action and is *likely* to incite or produce such action.'" *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 253 (2002) (quoting *Brandenburg*, 395 U.S. at 447) (emphasis added); *Herceg*, 814 F.2d at 1022; *James*, 300 F.3d at 698; *see also Dworkin v. Hustler Magazine, Inc.*, 867 F.2d 1188, 1199-1200 & n.8 (9th Cir. 1989); *American Booksellers Ass'n v. Hudnut*, 771 F.2d 323, 329-30 (7th Cir. 1985), *aff'd*, 475 U.S. 1001 (1986). As the Supreme Court has explained, "the mere tendency of speech to encourage unlawful acts is not a sufficient reason for banning it." *Free Speech Coalition*, 535 U.S. at 253; *cf. Johnson*, 491 U.S. at 408-09 ("fighting words" doctrine applies only to speech likely to provoke immediate breach of peace); *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942) (same). Thus, the government may not punish speakers based solely on a prediction or suspicion that their words will tend, in the aggregate, to encourage undesired behavior. *See* PI Order at 15.

The Act comes nowhere near to satisfying the stringent *Brandenburg* standard. The Act is devoid of any legislative finding or underlying evidence that the video games covered by the Act are directed to and likely to cause imminent violent action. Nor could such a showing be

made, as every court to have considered the issue has concluded. *See Blagojevich*, 404 F. Supp. at 1073; *Granholm*, 426 F. Supp. 2d at 651; *see also AAMA*, 244 F.3d at 576, 578-79; *James*, 300 F.3d at 690; *see also* PI Order at 18 (noting that "[e]ven when provided with more time, in view of the foregoing, it is unlikely that the State will be able to establish that any video games are directed toward inciting imminent lawless action or that they are likely to cause such action").

The Act's second stated interest – in preventing "psychological harm" to minors – is equally flawed. That interest is nothing more than an interest in controlling minors' thoughts – a wholly impermissible reason for restricting protected speech. Indeed, the Court has held that the Act "cannot be defended on the grounds that it is designed to protect minors from some form of 'psychological harm,' as that amounts to nothing more than 'impermissible thought control.'" PI Order at 15. The First Amendment forbids governmental restrictions on speech based on the provocative or persuasive effect of that speech on its audience. *See Boos v. Barry*, 485 U.S. 312, 321 (1988) (O'Connor, J.) (striking ban on picketing near embassies where purpose was to protect the emotions of those who reacted to the picket signs' message); *Texas v. Johnson*, 491 U.S. at 408-09 (interest in protecting bystanders from feeling offended or angry is not sufficient to justify ban on expression). As the Supreme Court has noted, "First Amendment freedoms are most in danger when the government seeks to control thought or to justify its laws for that impermissible end." *Free Speech Coalition*, 535 U.S. at 253.

The government does not have a generalized power to limit minors' exposure to creative works based on a belief that they may be "psychologically harmful."[5] PI Order at 15-16; *IDSA*,

---

[5] Like adults, minors have a First Amendment right to be free from content-based governmental regulation of the speech they utter or receive. *See, e.g., McConnell v. Federal Election Comm'n*, 540 U.S. 93, 231 (2003) ("Minors enjoy the protection of the First Amendment"); *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213-14 (1975); *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506-07, 511 (1969).

329 F.3d at 959-960 ("[In no case] does the Supreme Court suggest that the government's role in helping parents to be the guardians of their children's well-being is an unbridled license to governments to regulate what minors read and view. . . . [T]he government cannot silence protected speech by wrapping itself in the cloak of parental authority."); *Blagojevich*, 404 F. Supp. 2d at 1076 (same). *Cf. AAMA*, 244 F.3d at 577 ("[There is] there is a serious "danger of allowing government to control the access of children to information and opinion," as "[p]eople are unlikely to become well-functioning, independent-minded adults and responsible citizens if they are raised in an intellectual bubble."). Thus, the State simply may not restrict video game expression merely because it dislikes the way that expression shapes individuals' thoughts and attitudes. *See Blagojevich*, 404 F. Supp. 2d at 1074 ("In this country, the State lacks the authority to ban protected speech on the ground that it affects the listener's or observer's thoughts and attitudes."). As this Court has already recognized, the State's "psychological harm" rationale – as with the "physical harm" rationale – cannot survive strict scrutiny.

    **b) The State Is Unable to Offer "Substantial Evidence" of Harm Purportedly Cured by the Act.**

The Act fails the first prong of the strict scrutiny analysis for the additional reason that there is no "substantial evidence" of a harm purportedly cured by the Act. *See Turner*, 512 U.S. at 664 (to withstand constitutional scrutiny, the government must demonstrate a compelling interest backed by "substantial evidence"). Although the State has suggested that the legislative record contained evidence demonstrating that "violent" video games are harmful, the Court has already reviewed this evidence and determined that it "is sparse and could be hardly be called in any sense reliable." PI Order at 17-18. Indeed, the Court has found that the social science articles submitted to the Legislature were inconclusive in their results and/or related to exposure to media other than video games. *Id.*

The Court's conclusion is consistent with every court to have reviewed similar evidence, including four courts in the last nine months. *See, e.g., Hatch*, 2006 WL 2162302, at *3 (finding on summary judgment that State's evidence was "far too slight to bear the weight of the State's argument" and that the State "is entirely incapable of showing a causal link between the playing of video games and any deleterious effect on the psychological, moral, or ethical well-being of minors"); *Granholm*, 426 F. Supp. 2d at 653 (holding on summary judgment that the State's evidence "falls far short of the 'substantial evidence' requirement needed to restrict free speech"); *Blagojevich*, 404 F. Supp. 2d at 1073 (finding that the State had "come nowhere close" to showing that video games made minors more violent under *Brandenburg* and that it had "failed to present substantial evidence showing that playing violent video games causes minors to have aggressive feelings or engage in aggressive behavior"); *Schwarzenegger*, 401 F. Supp. 2d at 1046 (granting preliminary injunction and stating that the "court anticipates that the [State] may face similar problems to those [shown in other cases] proving the California legislature made 'reasonable inferences based on substantive evidence.'") (quotation omitted); *IDSA*, 329 F.3d at 958 ("The County's conclusion that there is a strong likelihood that minors who play violent video games will suffer a deleterious effect on their psychological health is simply unsupported in the record."); *Maleng*, 325 F. Supp. 2d at 1188--89 ("[T]he Court finds that the Legislature's belief that video games cause violence, particularly violence against law enforcement officers, is not based on reasonable inferences drawn from substantial evidence."); *AAMA*, 244 F.3d at 578-79 ("The [government's] studies do not find that video games have ever caused anyone to commit a violent act, as opposed to feeling aggressive, or have caused the average level of violence to increase anywhere.").

In short, there is no social science – much less "substantial evidence" – supporting the

conclusion that video games containing depictions of violence cause psychological harm to minors. Thus, the Act fails strict scrutiny.

### c) The Act Does Not Materially Advance the State's Interests and Is Not Narrowly Tailored.

Even assuming that the State's justifications for the Act were not facially illegitimate and unsupported by evidence, the Act would still fail First Amendment scrutiny. The State cannot show that the Act's prohibitions materially address the State's alleged interests or that the Act is the least restrictive means of serving those interests. See PI Order at 18 (noting that State's argument to the contrary is "implausible").

First, the State would have to demonstrate that the Act's restrictions actually and materially address the alleged government interests. *See, e.g., Turner*, 512 U.S. at 664-65; *Hatch*, 2006 WL 2162302 at *3; *Maleng*, 325 F. Supp. 2d at 1189. Here, the fact that the State has singled out video games — even though a wide range of media make comparable violent expression available to minors — is strong evidence that the Act fails to advance the State's interests. *See* PI Order at 18-19; *Florida Star v. B.J.F.*, 491 U.S. 524, 540 (1989) (the "facial underinclusiveness" of a regulation undermines the claim that the regulation serves its alleged interests).

"Violent" video games "are a tiny fraction of the media violence to which modern American children are exposed." *AAMA*, 244 F.3d at 579. But the Act leaves these other media unaffected. Under the Act, for example, a minor could be legally barred from buying or renting an "M"-rated video game containing "violent" content, but that same minor could legally buy or rent the movie and book on which the video game was based. *See* PI Order at 19; Price Decl. ¶¶ 4, 20, 32, 40, 54 (noting similarities between M-rated games and many films and books). Thus, the Act in no way serves its proffered purpose of limiting minors' exposure to violent

content, and instead singles out video games for speech restrictions. *See* PI Order at 19; *Hatch*, 2006 WL 2162302 at *3 (finding that "[t]here is no showing that restricting video games alone would alleviate the State's concern about . . . children" and "there is no showing whatsoever that video games, *in the absence of other violent media*, cause even the slightest injury to children"); *Granholm*, 426 F. Supp. 2d at 654 ("Not only does the Act not materially advance the State's stated interests, but it appears to discriminate against a disfavored 'newcomer' in the world of entertainment media. Thus, 'singling out' the video game industry does not advance the State's alleged goals and therefore does not fulfill the strict scrutiny requirement."); *Blagojevich*, 404 F. Supp. 2d at 1075 ("In fact, the underinclusiveness of this statute—given that violent images appear more accessible to unaccompanied minors in other media— indicates that regulating violent video games is not really intended to serve the proffered purpose.").

Moreover, the Act fails strict scrutiny because it is not narrowly tailored. The narrow tailoring requirement means that the State must prove that "a plausible, less restrictive alternative" to banning such games "will be ineffective to achieve its goals." *Playboy*, 529 U.S. at 816. The State cannot make such a showing here, where such alternatives exist, including encouraging awareness of the voluntary ESRB video game rating system (which provides guidance to parents and other consumers) and the availability of parental controls that allow each household to determine which games their children can play. PI Order at 19; *see Playboy*, 529 U.S. at 824-25 ("A court should not assume a plausible, less restrictive alternative would be ineffective; and a court should not presume parents, given full information, will fail to act."); *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 507-08 (1996) (plurality op.) (striking down ban on advertising alcohol prices because of less restrictive alternatives, such as an "educational campaign" or "counterspeech"); *Ashcroft*, 542 U.S. at 671-72 (noting that rapid technological

developments may create alternatives displacing the rationale for imposing speech restrictions).

Indeed, while the Act was being considered, Plaintiffs informed both the Legislature and the Governor about voluntary efforts to enforce and educate consumers about the ESRB rating system, and about the availability of technological parental controls.[6] Lowenstein Decl. ¶¶ 16-17; Andersen Decl. ¶ 18. Plaintiffs explained that educating parents and the public about the ESRB rating system would be a particularly effective alternative means of achieving the State's goals, given that the FTC has found that parents are involved in 83% of video games purchases for minors. Lowenstein Decl. ¶¶ 10, 16.[7] The State cannot meet its burden of demonstrating the absence of less restrictive alternatives where it declined Plaintiffs' offer to work with it to help educate consumers about the well-established and comprehensive ESRB system, and instead proceeded to adopt the Act's restrictive measures.

## V. THE ACT IS UNCONSTITUTIONALLY VAGUE.

The Act is unconstitutional on an independent ground: vagueness. Because several of the Act's key terms are impermissibly vague and place the burden of compliance on game retailers, the Act will restrict a far broader range of expression than even the State claims it is seeking to regulate. The Constitution demands that statutes be set forth with "sufficient

---

[6] All three of the next-generation game consoles manufactured by Microsoft, Nintendo, and Sony will include parental controls allowing parents to limit a child's access to games based on the games' ESRB rating, an option that Microsoft's latest console already offers. Lowenstein Decl. ¶ 17. This technology is similar to the voluntary filtering and blocking technologies that the Supreme Court identified as less restrictive alternatives to prohibitions on speech. *See Ashcroft*, 542 U.S. at 668-69; *Playboy*, 529 U.S. at 824-25.

[7] Further, the Henry J. Kaiser Family Foundation's research has found that parents say that among all entertainment rating systems (TV, movies, music and games), the ESRB ratings are the most "useful." And in its reports on the rating systems of the video game, movie, and music industries, the FTC has found that the video game industry does a *better* job than its media counterparts (DVD's, CD's) in ensuring that unaccompanied minors are unable to buy age-inappropriate material. Lowenstein Decl. ¶ 5.

definiteness that ordinary people can understand what conduct is prohibited." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). Such precision is essential to "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). In particular, exacting precision is required of restrictions in the context of protected expression. *See Reno*, 521 U.S. at 871-72 (explaining that the vagueness of a "content-based regulation of speech," particularly one imposing criminal penalties, "raises special First Amendment concerns because of its obvious chilling effect on free speech"); *NAACP v. Button*, 371 U.S. 415, 433 (1963).

The Act's definition of a prohibited "violent" video game fails to give reasonable notice of what conduct is prohibited. Indeed, the Court has recognized that terms in the Act such as "morbid interest" have no clear meaning, and that the Act contains "no explanation of crucial terms such as 'violence.'" PI Order at 25. Other vague terms include, but are not limited to: depictions of violence that are "patently offensive to prevailing standards in the community as to what is suitable for minors," and games which lack "serious literary, artistic, political, or scientific value for minors." Such terms have no clear meaning in the context of violent video games. *See Video Software Dealers Ass'n v. Webster*, 968 F.2d 684, 690 (8th Cir. 1992) (affirming district court's conclusion that statute lacks requisite specificity because, *inter alia*, term "morbid" was not defined); *Granholm* 426 F. Supp. 2d at 655-56 (striking down statute with parallel language); *cf. Winters*, 333 U.S. at 513, 518-19 (striking down as vague a statute prohibiting the distribution of tales of criminal deeds of bloodshed and lust "so massed as to become vehicles for inciting violent and depraved crimes against the person" and appealing "to that portion of the public who (as many recent records remind us) are disposed to take to vice for

its own sake").[8]

The vagueness of the Act's terms will make it difficult if not impossible to determine which video games might be subject to the Act's criminal penalties. *See* PI Order at 25. For example, video games present a range of options to a player and often involve fantastic and superhuman characters. Andersen Decl. ¶¶ 14, 15. A retailer cannot predict in advance whether a player controlling a character's actions, when confronted with a wide variety of options while playing the game, may take actions that display a "morbid" interest in violence. *See id.* ¶ 15; Price Decl. ¶¶ 24, 31, 39, 47, 52, 58. Nor can a retailer readily determine whether violent actions depicted in video games during wartime or against superhuman enemies, for example, would display this "morbid" interest or be "patently offensive" to undefined "prevailing standards." *See* Andersen Decl. ¶¶ 14, 16; Price Decl. ¶¶ 13, 19-24, 31, 37, 38, 45, 49-52, 57-58.

Because of its vague terms, persons of ordinary intelligence will be forced to guess at the meaning and scope of the Act. Andersen Decl. ¶¶ 11-13; PI Order at 25; *see Webster*, 968 F.2d at 690. And because video games offer the player a wide range of possible game play of significant duration, retailers would be expected to review the entire possible course of play in a particular game to ensure that the game does not violate the Act. *See* Andersen Decl. ¶ 11. "The lack of precision among these definitions will subject [State] retailers to steep . . . criminal liability if they guess wrongly about what games the Act covers. Retailers will respond by either self censoring or otherwise restricting access to any potentially offending video game title." *Granholm*, 426 F. Supp. 2d at 656; *see* PI Order at 25-26; *Blagojevich*, 404 F. Supp. 2d at 1077 ("[T]his [vague] definition leaves video game creators, manufacturers, and retailers guessing

---

[8] Although the State has apparently attempted to harness the standard for sexual obscenity in the context of violent video games, the "'harmful to minors' standard for sexually explicit speech cannot be expanded to cover depictions of violence." *Granholm*, 426 F. Supp. at 655-56. PI Order at 25.

18

about whether their speech is subject to criminal sanctions."); *Maleng*, 325 F. Supp. 2d at 1191 ("The problem is not . . . that a retail clerk may be unaware of the contents of a particular game. . . . The real problem is that the clerk might know everything there is to know about the game and yet not be able to determine whether it can be legally sold to a minor."). Such understandable, self-protective behavior will deprive access to such expression not just to minors, but to adult customers as well — who unquestionably have the right to access the video games covered by the Act. Andersen Decl. ¶¶ 15-17; Price Decl. ¶¶ 13-14.

## VI. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court grant summary judgment to Plaintiffs, and issue a declaratory judgment against the Attorney General and the class of all Louisiana District Attorneys finding the Act unconstitutional. Plaintiffs also request that the Court permanently enjoin the class of all Louisiana District Attorneys from enforcing the Act.[9] Further, Plaintiffs are reserving their right to move for their attorneys' fees and costs pursuant to 42 U.S.C. § 1988, as requested in the Complaint, after entry of summary judgment, in accordance with Federal Rule of Civil Procedure 54(d)(2) and Local Rule 54.

---

[9] Consistent with Plaintiffs' Motion for Class Certification, Plaintiffs request that declaratory relief and permanent injunction be granted against the class of all District Attorneys in the State of Louisiana.

Respectfully submitted,

_____
James A. Brown, T.A. (Bar #14101)
George Denegre, Jr. (Bar #8387)
LISKOW & LEWIS
One Shell Square
701 Poydras Street, Suite 5000
New Orleans, LA 70139-5099
Telephone:(504) 581-7979
Facsimile: (504) 556-4108

and

Paul M. Smith
Katherine A. Fallow
Matthew S. Hellman
Duane C. Pozza
JENNER & BLOCK LLP
601 13th Street, NW, Suite 1200
Washington, DC 20005
Telephone: (202) 639-6000
Facsimile: (202) 639-6066

Attorneys for Entertainment Software Association
and Entertainment Merchants Association

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the above and foregoing pleading has been served upon Charles C. Foti, Jr., in his official capacity as Attorney General of the State of Louisiana and Doug Moreau, in his official capacity as District Attorney for the Parish of Baton Rouge, by facsimile this 30 day of August 2006.

_____

634847_1.DOC